# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 13-206-02 |
| RASHIDAH BRICE | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant and her co-defendant sold the bodies of a minor, when the minor was ages 16-17, over the internet, and profited from her sexual exploitation. The defendant also attempted to traffic two adults for purposes of prostitution over the Internet, and subjected them, as well as the minor, to force, threats of force, and coercion. In addition, the defendant produced two child pornography videos of the same minor, including one in which the minor was engaging in a sexual act with the defendant herself. The government asks the Court to consider all of the factors set forth below in fashioning an appropriate sentence.

The Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in United States v. Booker, 543 U.S. 220 (2005):

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before Booker.
>
> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-Booker case law, which continues to have advisory force.
>
> (3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

United States v. Gunter, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (citing United States v. King, 454 F.3d 187, 194, 196 (3d Cir. 2006); United States v. Cooper, 437 F.3d 324, 329-30 (3d Cir. 2006)). See also United States v. Smalley, 2008 WL 540253, *2 (3d Cir. Feb. 29, 2008) (stating that the Gunter directive is consistent with later Supreme Court decisions). In calculating the guideline range, this Court must make findings pertinent to the guideline calculation by applying the preponderance of the evidence standard, in the same fashion as was employed prior to the Booker decision. United States v. Grier, 475 F.3d 556 (3d Cir. 2007) (en banc). The failure to properly calculate the advisory guideline range will rarely be harmless error. United States v. Langford, 2008 WL 466158, *8-11 (3d Cir. Feb. 22, 2008).

At the third step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence. "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." Cooper, 437 F.3d at 329. See also Rita v. United States, 127 S. Ct. 2456, 2468 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); United States v. Schweitzer, 454 F.3d 197, 205-06 (3d Cir. 2006).

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors.

I.   **BACKGROUND**

Between May 25, 2012, and February 3, 2013, the defendant and her co-defendant and paramour, Christian Womack, recruited three females, one of whom was a minor about to turn 17, with the intention that these females work for the defendants as prostitutes. Presentence Investigation Report ("PSI") ¶ 10.   Defendants advertised all three of these females on an Internet website known as Backpage.com, harbored them in various hotels in Philadelphia, Pennsylvania; Claymont, Delaware; and Atlantic City, New Jersey; and caused the minor to engage in sexual acts with numerous adult men in these locations.   Id. ¶ 14-42.   Defendants collected 100% of the minor's profits from performing commercial sexual acts.

Minor 1 was approached by the defendants in May 2012 at a casino in Atlantic City after she was abandoned by the friends she had traveled there with. The defendants invited Minor 1 to their car and then informed her that she would be posing as a prostitute in order to steal money from "johns." Id. ¶ 13-15.   They then took Minor 1 to Trump Plaza Hotel, where the defendant threatened that Womack would harm her if she did not comply, and also punched and shoved her. Id. ¶ 15. After the minor relented, a man had sex with the minor and the defendant recorded a video of it with her phone, and then extorted more money from the man for having sex with a juvenile. Id. The defendants then took Minor 1 from Atlantic City to a hotel in Maryland, where the defendants punched, choked and shoved the minor to prevent her from leaving.   Id. ¶ 16. The defendants posted a prostitution advertisement featuring pictures of the minor on Backpage.com and drove her to Virginia Beach, Virginia, where the minor was forced to have sex with approximately 15 different men. Id.   Co-defendant Womack also threatened the minor with a handgun if she tried to leave. Id. ¶ 17.   The defendants then drove the minor to the Red Roof Inn Philadelphia Airport, where she was again advertised on Backpage.com and forced to prostitute

3

for five days; during that period, Womack put a gun to the minor's head several times. Id. ¶ 19. The minor eventually convinced a man to give her $50 for cab fare and she escaped; she later called her mother in New England, who called the Philadelphia Police, and the police found the minor and obtained her statement before returning her home. Id. ¶ 20-21.

The defendant approached Person 2 in July 2012 in Atlantic City, New Jersey, and offered Person 2 a ride to Pennsylvania. Person 2 accepted, and the defendant introduced her to Womack, and then the three were driven to Pennsylvania by Womack's mother. Id. ¶ 23. Womack began plying Person 2 with Percocet and suggested to Person 2 that she prostitute, but Person 2 was not interested. Id. ¶ 24. Nevertheless, the defendants took Person 2's cell phone and driver's license, posted her personal photographs on a Backpage.com prostitution advertisement, and tried to rent a car in her name. Id. ¶ 25. They also took money that was wired by Western Union to Person 2, and threatened to kill her if she left. Id. ¶ 26-27. After two days and without engaging in any commercial sex acts, Person 2 contacted her father, who came to get her. Id. ¶ 27. The defendants then called Person 2's father multiple times over the course of several days to make threats and attempt to extort money. Id.

Person 3 was introduced to Womack and the defendant in February 2013 through a friend. Id. ¶ 30. Womack and the defendant drove Person 3 and her friend to the Crowne Plaza hotel in Claymont, Delaware, where the four spent two days together. During that time, Womack continually gave Person 3 Percocet, and the defendants took photographs of Person 3 and her friend in their underwear, which the defendants then posted in Backpage.com advertisements. Id. ¶ 31. When the defendant and the friend left the hotel room to get a phone charger from the car, Womack attempted to rape Person 3. Person 3 awoke at 4:30a.m. to find Womack kneeling between her legs on the bed with a condom in his mouth which he was trying to unwrap, and

4

grabbing her thighs with such force that she had fingerprint marks on her legs for several days. Id. ¶ 34. When the defendant and the friend came back to the room and tried the door, which had the security chain across it, Person 3 jumped up and ran to lock herself in the bathroom. Id. Person 3 and her friend waited for the defendants to fall asleep and then put the defendants' clothing in the shower, turned it on, his their car keys, and took some money and Womack's wallet, being sure to write down his credit card information, which Person 3 later gave to the Marcus Hook Police. Id. ¶ 35. They took the bus back to the friend's house in Marcus Hook, and the defendants arrived soon thereafter. Id. ¶ 36. The defendant called Person 3's friend's phone repeatedly and threatened to kill both girls, while Womack walked around the side of the house. Id. The Marcus Hook Police then arrived and took a report from Womack, who alleged that he had been robbed by Person 3 and her friend. Id. After the police left, Womack called the friend's phone and gave Person 3's home address and threatened to kill her if she reported anything to the police. Id. ¶ 38. Later in the day, Person 3 made a report against Womack. Id.

## II. SENTENCING CALCULATION

### A. Statutory Maximum and Minimum Sentence.

Counts One - Three each carry a mandatory minimum term of 15 years in prison, a maximum of life in prison, a five-year minimum period supervised release, a lifetime maximum term of supervised release, a $250,000 fine, and a $100 special assessment. The total possible sentence is a mandatory minimum term of 15 years in prison (45 years if consecutive), a maximum of life in prison, a five-year minimum period supervised release, a lifetime maximum term of supervised release, a $750,000 fine, and a $300 special assessment.

B.   **Sentencing Guidelines Calculation.**

The parties stipulated in the Plea Agreement to the applicability of the following Sentencing Guidelines: a 3-level downward adjustment for acceptance of responsibility under USSG § 3E1.1(a).

The Probation Office calculated the Guidelines range starting with a base offense level of 34 for Count One, plus 2 points for supervisory control under Section 2G1.3(b)(1)(B), 2 points for undue influence under Section 2G1.3(b)(2)(B), 2 points for use of a computer under Section 2G1.3(b)(3), and 2 points for the commission of a sexual act under Section 2G1.3(b)(4), resulting in an adjusted offense level of 42. For Counts Two and Three, the calculation was a base offense level of 34, plus 2 points for use of a computer under Section 2G1.3(b)(3), and 2 points for the commission of a sexual act under Section 2G1.3(b)(4), resulting in an adjusted offense level of 38 per offense. Three units were added for three victims under 3D1.4, resulting in a an adjusted level of 45.   Subtracting 3 points for acceptance of responsibility, the Probation Office arrived at a total offense level of 42 and a Guidelines range, in light of a Criminal History Category of I, of 360 months to life in prison.

## III.   ANALYSIS

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that this Court should consider the calculation of the advisory guidelines as set forth in the Presentence Investigation Report, the calculation set forth in the plea agreement, review all other factors, and impose an appropriate sentence.

The Supreme Court has declared:   "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 128 S. Ct. 586, 596 (2007).   As will be discussed later, the Sentencing

Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

The depravity of this offense cannot be understated. The defendant was directly involved in the sex trafficking of a minor, resulting her body being sold as chattel to countless strangers at the time of her 17th birthday. Her actions clearly resulted in the emotional destruction of the child who was victimized, as evidenced by her own statement. The minor also attended an intensive residential treatment program for child victims of trafficking called "Children of the Night" in Los Angeles for a year. Further, though not charged with production of child pornography, the defendant herself produced two videos of the minor engaging in sexually explicit conduct, including one act involving the defendant herself. The impact of this crime on the minor victim is likely irrevocable. The defendants also attempted to traffic two adult women by force, engaging in various threats, use of physical violence, and coercion to attempt to obtain compliance

by the victims. The defendant was equally involved with her co-defendant in these efforts. The defendant must be adequately punished for this reprehensible crime.

The Court must also consider the nature of the offender. The defendant has one 2012 conviction for engaging in prostitution, but no other criminal convictions; she does have numerous prior arrests. Id. ¶ 88. Her key source of income prior to arrest appears to have been prostitution and work as an "exotic dancer." Id. ¶ 121, 123-24. Defendant reports that she was sexually molested by her father, and dropped out of high school when he died. Id. ¶ 101, 119. She met the co-defendant in 2008 and has two children with him. Id. ¶ 103. When the defendant was arrested for the instant offense, the agents noted that there was no furniture in the apartment except for an air mattress and large television, no crib for either child, and no food. Id. ¶ 104. The defendant claims to have unverified serious medical problems, but received a misconduct at the Federal Detention Center ("FDC") for Malingering and Feigning Illness. Id. ¶ 106-07. The defendant also was put on an opioid detoxification protocol when she entered the FDC, and admits to a history of using marijuana, cocaine, and pain killers. Id. ¶ 107, 113. She is classified as "Care Level 3" (mental health) at the FDC; while the FDC has not diagnosed her with a mental illness, she has presented some indications of schizotypal personality disorder and borderline, histrionic, and antisocial features. Id. ¶ 108-110. In sum, the defendant appears to be a troubled individual.

Additionally, the Court should fashion a sentence that will "reflect the seriousness of the offense and promote respect for the law." 18 U.S.C. § 3553(a)(2). The recommended sentence also should afford adequate deterrence to others who would commit a similar offense, and lead to consistency in sentencing. Id. This crime of increasing prevalence must be deterred, and the Court should send a message to the countless others who would engage in this

far-too-simple crime that the sex trafficking of minors or of adults will not be tolerated.

Finally, Title 18, United States Code, Section 1593 requires mandatory restitution. Pursuant to 18 U.S.C. §§ 1593(b)(3) and 2259(b)(3)(A), this should include psychological care of the victims. Given the average current cost of psychotherapy of $100 per hour, and contemplating weekly psychotherapy for two years for each victim, this would result in an award of $10,400 per victim.

## IV. **CONCLUSION**

For the reasons set forth above, the government respectfully requests that the Court fashion an appropriate sentence, taking into account the Guidelines calculation by the Probation Office, the calculation set forth in the plea agreement, and other factors.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


____/s/Michelle L. Morgan_____
MICHELLE L. MORGAN
Assistant United States Attorney


____/s/Melanie Babb Wilmoth_____
MELANIE BABB WILMOTH
Assistant United States Attorney

# CERTIFICATE OF SERVICE

I certify that on this day I caused a copy of the Government's Sentencing Memorandum to be served by electronic filing, and/or first-class mail, addressed to:

Rossman Thompson, Esq.
Federal Defender Association
Suite 540 West - The Curtis Center
601 Walnut Street
Philadelphia, PA 19106

   /s/ Michelle L. Morgan_____
MICHELLE L. MORGAN
Assistant United States Attorney

Dated: October 10, 2014